IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Dontee L. Brown (20866), )
)
       Plaintiff, )
) Case No: 16 C 50337
       v. )
)
Lt. Tim Erickson, et al., ) Judge Philip G. Reinhard
)
       Defendants. )

## ORDER

Plaintiff Dontee L. Brown, a pre-trial detainee at the Whiteside County Jail, brought this action *pro se* pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants jail administrator Lt. Erickson and medical personnel Dr. Alma Martija and nurse Julie Warkins provided him with inadequate medical care in violation of his constitutional rights. Before the court are defendants' motions for summary judgment. For the reasons set forth below, defendants' motions [69] [72] are granted. This case is dismissed in its entirety. Final judgment shall enter.

## STATEMENT-OPINION

**A.    PROCEDURAL BACKGROUND**

Local Rule 56.1 sets out a procedure for presenting facts pertinent to a party's request for summary judgment pursuant to FED. R. CIV. P. 56. Specifically, Local Rule 56.1(a)(3) requires the moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Each paragraph of the movant's statement of facts must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). The opposing party must file a response to each numbered paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C).

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [Local Rule 56.1] statements." *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (third alteration in original) (internal quotation marks omitted); *Stevo*

1

*v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Plaintiff's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 Fed. Appx. 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules.").

Because plaintiff is proceeding *pro se*, defendants each served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. ([75], ]76].) This notice explained how to respond to defendants' summary judgment motions and Rule 56.1 Statements and cautioned plaintiff that the court would deem defendants' factual contentions admitted if he failed to follow the procedures delineated in Local Rule 56.1. (*Id.*)

Plaintiff failed to respond to defendants' undisputed facts.[1] Instead, plaintiff submitted a two-page "response" to defendant Erickson's motion for summary judgment.[2] ([83].) This document generally disputes defendants' version of events but cites to no supporting factual information. (*Id.*) The court thus considers defendants' statements of fact to which plaintiff did not properly respond, as admitted. Notwithstanding these admissions, the court construes plaintiff's submissions, and the record evidence, in the light most favorable to him. With these guidelines in mind, the court turns to the facts of this case.

---

[1] The court notes that after the timely filing of his "response" ([83]) on October 12, 2018, plaintiff submitted two letters to the court ([84], [88]). In both of these letters, plaintiff conveys, as he has in the past, his purported inability to meaningfully respond to defendants' summary judgment motions on his own. The court finds plaintiff's position disingenuous given the procedural history of this case and the fact that this is not the first time that he has claimed to be unable to meaningfully litigate this case on a *pro se* basis. Specifically, the docket reflects that the court initially assigned counsel in this case and the attorney was permitted to withdraw (based on recruited counsel's representations that he had been "discharged" by plaintiff due to "[a] difference of opinion[.]"). (*See* [79] at pg. 2.) In its September 21, 2018 order denying plaintiff's renewed request for counsel (*see id.*), the court noted plaintiff's claim was not particularly complex (legally or factually). (*Id.* at pg. 2.) In that order, the court also addressed plaintiff's concerns about responding to defendants' summary judgment motions, explaining that it found plaintiff's contentions about access to legal materials and his inability to respond meaningfully, on his own, to defendants' motion "highly dubious" given that plaintiff (who has been confined at Whiteside County Jail since the filing of this case) had competently litigated the case on a *pro se* basis for over a year (up until his recruited attorney was permitted to withdraw in May 2017). (*Id.*) The court went on to explain that during that time, plaintiff complied with court instructions and deadlines, and filed appropriate motions and pleadings. (*Id.*) The court also explained that, with respect to the summary judgment motions, plaintiff was served with Rule 56.2 notices that explain what plaintiff must do to oppose summary judgment. (*Id.*) The court also noted that plaintiff's concerns about the potential of having his case "thrown out" for not complying with court rules (or rules of civil procedure) were generalized and hypothetical in nature and did not warrant the recruitment of new counsel. (*Id.*)

[2] This document is captioned as a response to defendant Erickson's summary judgment motion; however, it also references the other defendants in this action. As such, the court construes plaintiff's "response" to be directed at both defendant Erickson's summary judgment motion and the summary judgment motion of defendants Dr. Martija and nurse Warkins.

B.   FACTUAL BACKGROUND

Plaintiff Dontee Brown is a pre-trial detainee in the Whiteside County Jail ("jail"). He has been detained in the jail since February 25, 2016 to the present, except for a period from March 31, 2016 to June 22, 2016, when he was in the custody of the Illinois Department of Corrections ("IDOC"). ([70] at ¶ 3; [73] at ¶ 2.)

In his amended complaint ([19]), plaintiff alleged that in March 2016, he was given the wrong medication by a correctional officer at the jail. He also claimed that he was forced to take his prescribed medication in addition to the wrong medication that day. According to the amended complaint, plaintiff began to experience chest and abdominal pain and diarrhea following the incident. Plaintiff claimed that he alerted jail officials to his conditions and that he received no medical attention. Plaintiff claimed further that in June 2016, he alerted jail officials that he had been experiencing abnormal bowel movements and stomach pains since the end of March. Plaintiff claimed that he saw nurse Warkins at the end of June 2016, and she became frustrated with him and left before rendering any medical attention. Plaintiff claimed that he filed grievances about this incident, made verbal complaints, and was finally seen by nurse Warkins (who indicated to him that his problems were "in his head"). Plaintiff also alleged in the amended complaint that he had been taking psychotropic medication for three years to help him control his PTSD and night terrors. Plaintiff claimed that, at some point, he met with Dr. Martija and complained about abdominal and bowel issues. Plaintiff claimed that Dr. Martija refused to send him to an outside hospital, ordered him to be taken off of his medications, and refused to put him back on his mental health medication. Plaintiff claimed that Dr. Martija became "fixated" on his blood pressure, refused to order him an MRI, and refused to put him back on his prescribed medication for PTSD and night terrors. Plaintiff also claimed that Dr. Martija forced him to take a medicine called Clonidine, which caused insomnia and induced nightmares. Plaintiff claims that he complained to Lt. Erickson about these issues, and Lt. Erickson failed to adequately address them. (*Id.* at pgs. 5-8.) The court found that plaintiff's allegations about the medical care (or lack thereof) that he received for his abdominal/bowel issues (allegedly following the ingestion of the wrong medication) and his PTSD and night terrors were sufficient to state a claim for deliberate indifference to his serious medical needs against Lt. Erickson, nurse Julie Warkins, and Dr. Alma Martija. ([20] at pg. 3.) All other claims and defendants were dismissed. (*Id.*)

*Facts Relevant to Defendants Dr. Martija and Nurse Warkins*

Defendant Alma Martija, M.D. was employed by Advanced Correctional Healthcare, Inc. ("ACH"), as of September 2, 2016, to provide medical care at the jail in person once every other week and phone consultation 24 hours per day, seven days per week. ([70] at ¶ 1.)

Defendant Julie Warkins, L.P.N. was employed as a site nurse by ACH from April 21, 2011 to March 10, 2017 to provide nursing care at the jail in person during weekdays. Nurse Warkins was not allowed to prescribe medication as a part of her duties at the jail. (*Id.* at ¶ 2.)

At some time prior to his incarceration at jail, plaintiff began suffering from nightmares and waking up with the taste of leather and metal in his mouth. (*Id.* at ¶ 6.) As a result of these symptoms, plaintiff was diagnosed with PTSD by an individual at the IDOC. (*Id.* at ¶ 7.) Upon

3

arriving at the jail, plaintiff was taking Paxil (for PTSD), Naproxen, and Prazosin (for high blood pressure). (*Id.* at ¶ 8.) Plaintiff was provided with Prazosin and Paxil for the dates of March 7, 2016 through March 30, 2017. (*Id.* at ¶ 9.) Prazosin and Paxil were the same medications plaintiff was taking on the outside prior to his incarceration at the jail. (*Id.* at ¶ 10.) According to plaintiff, the effectiveness of Prazosin and Paxin "was kind of like up and down." ([69-3] at pg. 20:24; 21:1.)

On March 22, 2016, plaintiff filled out a sick-call request form stating that he threw up blood, was having night terrors, and bad tastes in his mouth. ([70] at ¶ 12.) Plaintiff had thrown up blood in the toilet. No one else saw the vomit. (*Id.* at ¶ 13.) Plaintiff's sick-call request from March 22, 2016 was acknowledged by nurse Warkins, and it was indicated that plaintiff's medications for PTSD were to be increased. (*Id.* at ¶ 14.)

On March 27, 2016, plaintiff was given the wrong medication by a correctional officer. (*Id.* at ¶ 15.) In a sick-call request dated March 30, 2016, plaintiff stated that the incorrect pill was a purple and grey capsule, and that since taking it, his chest felt tight, his stomach did not feel right, and he had a loose and runny bowel movement. (*Id.* at ¶ 16.) This sick-call request was acknowledged by nurse Mary Brandon, and it was indicated that plaintiff was accidentally given Prilosec, which would not give him chest pains. Rather, it was indicated that plaintiff's issues were most likely due to his anxiety. (*Id.* at ¶ 18.) At his deposition, plaintiff testified that he continues to have abdominal pain. (*Id.* at ¶ 17.)

On March 31, 2016,[3] plaintiff was transferred to Stateville Correctional Center ("Stateville"). (*Id.* at ¶ 20.) While at Stateville, plaintiff was prescribed Prazosin 4mg for his high blood pressure and Remeron 30mg for PTSD. (*Id.* at ¶ 21.) Plaintiff testified that the Prazosin and Remeron were the most helpful for his mental health issues. (*Id.* at ¶ 22.) Upon his return to the jail on June 22, 2016, plaintiff's Prazosin and Remeron[4] prescriptions were continued. (*Id.* at ¶ 23; [73-4] at ¶ 4.) Plaintiff received his prescribed Remeron and Prazosin through at least July 31, 2016. ([70] at ¶ 24.)

Plaintiff testified that in late June 2016, nurse Warkins came to his cell and called him out to the door. Plaintiff testified that he discussed his medication with her and then began to explain the abdominal issues he was having. (*Id.* at ¶ 25.) Plaintiff testified that before he was able to fully express the abdominal issues he was having, an officer pushed him back into his cell and the officer and nurse Warkins left. (*Id.* at ¶ 26.) If an inmate at the jail wishes to speak with a nurse regarding an issue, the person is to fill out a sick call request form. The inmate is not to simply attempt to talk to a nurse as he or she walks by the cell. (*Id.* at ¶ 27.) Plaintiff testified that he

---

[3] The court notes defendants Martija and Warkins indicate in their Statement of Material Facts that plaintiff was transferred to Stateville on March 31, 2017, and they cite to plaintiff's deposition testimony in support of this statement. ([70] at ¶ 20.) This particular date appears to be a typo given that plaintiff's cited deposition testimony indicates he was transferred to Stateville on March 31, 2016 (not 2017). ([69-3] at pg. 29:12-17.) The 2016 date is also consistent with other evidence in the record, namely defendant Lt. Erickson's affidavit (*see* [73-2] at ¶ 4.)

[4] Defendants Martija and Warkins point out in their Statement of Material Facts that "Remeron is a brand name for Mirtazapine." ([70] at ¶ 23.) According to information available on WebMD, Mirtazapine is used to treat depression. Mirtazapine is identified as a "generic" for the "common brand" Remeron. *See* https://www.webmd.com/drugs/2/drug-13706-2047/mirtazapine-oral/mirtazapine-disintegrating-tablet-oral/details (last visited April 8, 2019).

then made a verbal grievance regarding nurse Warkins leaving before he explained his condition to her. (*Id.* at ¶ 28.) Plaintiff testified that, in response, nurse Warkins returned to plaintiff's cell and he explained he had been having abdominal pain since taking the incorrect medication (Prilosec) on March 27, 2016. (*Id.* at ¶ 29.)

On July 7, 2016, plaintiff was seen for abdominal pain and diarrhea. The record of this visit was signed by nurse Warkins. Plaintiff's complaints were forwarded to the doctor, and, as a result, plaintiff was prescribed Zantac. (*Id.* at ¶ 30.) Plaintiff testified that Zantac was not helpful for his abdominal pain and diarrhea. (*Id.* at ¶ 31.) Plaintiff received Remeron and Prazosin for the entire months of August and September 2016.[5] (*Id.* at ¶¶ 32, 33.)

On November 10, 2016, plaintiff was seen by Dr. Martija. At that time, Dr. Martija understood that plaintiff was complaining that his medications were not working well enough and that he was asking for an increase in dosage. (*Id.* at ¶ 35.) Dr. Martija discontinued plaintiff's Remeron and Prazosin on November 10, 2016 because she believed that plaintiff was complaining that the medication was not effective and that he therefore wanted more than the current dosage. (*Id.* at ¶ 36.) Plaintiff testified that he did not ask for a higher dosage of Remeron on November 10, 2016. Rather, he asked that they change the delivery of the medication from night time to day time. Plaintiff testified that he believes that the doctor confused this request. (*Id.* at ¶ 37.) Dr. Martija then prescribed Clonidine for plaintiff's blood pressure and anxiety issues as a replacement for Prazosin and Remeron and ordered blood pressure checks three times a week with a log for plaintiff. Clonidine can be used to treat both high blood pressure and anxiety disorders. (*Id.* at ¶ 38.) The Clonidine helped plaintiff relax during the day and when he slept, but he still had night terrors. (*Id.* at ¶ 41.)

At some point, plaintiff complained to Dr. Martija that he was having abdominal pain as a result of ingesting the incorrect medications. The doctor performed an examination and noted that there were normal abdominal findings. She ordered that this condition continue to be monitored. Because the complaint and cause of the complaint were vague, Dr. Martija found it to be reasonable to observe plaintiff for a progression of symptoms during the subsequent times that she saw him. (*Id.* at ¶ 39.)

On November 14, 2016, nurse Warkins attempted to check plaintiff's blood pressure pursuant to Dr. Martija's orders, but plaintiff refused. (*Id.* at ¶ 40.) The Clonidine helped plaintiff relax during the day and sleep, but he still had night terrors. (*Id.* at ¶ 41.) On November 22, 2016, plaintiff refused to go to the nurse for sick call and stated that it was a waste of time. (*Id.* at ¶ 42.) As plaintiff continued to refuse to be treated for his high blood pressure, Dr. Martija ordered that plaintiff be put on medical watch to monitor him for symptoms of hypertension. This record was also signed by nurse Warkins. (*Id.* at ¶ 43.) Plaintiff was seen by Dr. Martija on November 23, 2016. At that time, plaintiff was refusing to comply with his high blood pressure/hypertension treatment. This included a refusal to take Clonidine, which was also prescribed for plaintiff's

---

[5] The court notes that ¶ 33 of defendants' Statement of Material Facts indicates that plaintiff received Remeron and Prazosin for the entire month of August 2016, and it cites to plaintiff's medical records. ([70] at ¶ 33.) This date appears to be a typo given that it duplicates the prior factual statement (¶ 32) and is also inconsistent with the cited medical record (which shows plaintiff's medical chart/medications for the month of September 2016, not August 2016).

5

mental health issues. Dr. Martija explained the value of complying with the treatment at that time. (*Id.* at ¶ 44.) Plaintiff was seen by Dr. Martija and nurse Warkins on November 30, 2016. At that time, plaintiff was still non-compliant with his blood pressure/hypertension/anxiety medication. The importance of taking his medication was explained to plaintiff. (*Id.* at ¶ 45.)

On December 7, 2016, plaintiff refused medical treatment by Dr. Martija, and refused to allow his blood to be drawn for testing by nurse Warkins on December 28, 2016. (*Id.* at ¶ 46.) Nurse Warkins or Dr. Martija followed up on plaintiff's condition on December 12, 2016 (Clonidine was increased), December 15, 2016 (follow-up on blood pressure after increase in Clonidine); and December 22, 2016 (follow-up on blood pressure). (*Id.* at ¶ 47.)

On March 17, 2017, plaintiff complained of heartburn and was prescribed Zantac in order to treat that ailment. (*Id.* at ¶ 48.) On April 7 and 14, 2017, plaintiff put in sick-call requests, which indicated that his night terrors and mental symptoms were getting worse at that time. (*Id.* at ¶ 49.) In response to these complaints, plaintiff was seen by Dr. Martija on April 11, 2017. He was assessed with mood disorder and was started on a daily dose of Prozac for his mental conditions. (*Id.* at ¶ 50.) Plaintiff was seen by Dr. Martija on April 26, 2017. It was noted that plaintiff complained he wanted Remeron and Prazosin and that he could not sleep. The jail staff noted that plaintiff slept during the day. At this time, plaintiff was tolerating the Prozac, so it was continued. (*Id.* at ¶ 51.)

On June 22, 2017, plaintiff put in a sick-call request indicating that there were some negative effects of the prescribed Prozac and he requested to speak with the doctor about same. (*Id.* at ¶ 52.) On July 3, 2017, plaintiff put in a sick-call request stating that he believed the Clonidine and Prozac were making his sleep and dreams worse and that he was still having upper abdominal pain, so he wished to have an MRI. (*Id.* at ¶ 53.) Plaintiff was seen by the medical staff on July 6, 2017. There was no mention of abdominal pain at that this time. Plaintiff was treated for chest pain and a sore throat. Plaintiff's Prozac was also increased by Dr. Martija from 20mg to 40mg to address his issues with sleeping and nightmares. (*Id.* at ¶ 54.)

On July 8, 2017, plaintiff put in a sick call request for his chest, stomach, and throat, which were still bothering him. At this time, plaintiff attributed his conditions to black mold. (*Id.* at ¶ 55.) A nurse indicated that plaintiff's July 8, 2017 sick call request did not warrant any further medical work-up. (*Id.* at ¶ 56.)

On July 13, 2017, plaintiff was again given the incorrect medication, this time by correctional officer Curt Ebersohl. Dr. Martija ordered that plaintiff be monitored every half hour for the following six hours to determine if his blood pressure would remain steady as a result of the incorrect medication. (*Id.* at ¶ 57.) A follow-up was performed with plaintiff on July 14, 2017 regarding the July 13, 2017 medication error. (*Id.* at ¶ 59.)

On July 17, 2017, plaintiff put in a sick-call request claiming that his diarrhea and abdominal pain had continued from the first medication error and were getting worse. The following day, Bactrim was ordered for plaintiff, as his urine sample showed some blood and infection which would explain his abdominal pain. (*Id.* at ¶ 60.) Plaintiff was seen by Dr. Martija on July 20, 2017 and complained of abdominal pain and weight loss. The doctor indicated that

plaintiff was doing fine mentally and that based on her examination, there was no basis for the weight loss or abdominal pain claims. Plaintiff stated that his prescribed Ranitidine (Zantac) was helping. The Ranitidine was continued, as was the Bactrim for plaintiff's infection. (*Id.* at ¶ 61.)

On August 26, 2017, plaintiff put in a sick-call request claiming that he would like to speak with a doctor and nurse because the medication he was currently prescribed was not working. (*Id.* at ¶ 62.) On August 31, 2017, Dr. Martija prescribed plaintiff with Remeron, as requested by plaintiff, for his mental conditions. Plaintiff was not prescribed Prazosin as he requested because he was already prescribed a comparable medication (Clonidine). (*Id.* at ¶ 63.)

On September 14, 2017, plaintiff was seen by Dr. Martija and asked that his Prozac be discontinued and Remeron increased to twice a day. Remeron remained as prescribed and Prozac was discontinued as requested. (*Id.* at ¶ 64.)

On October 9, 2017, plaintiff stated that he wanted his Remeron increased from 15mg to 30 mg and complained that he has had pain in his "upper left quadrant" for one year. Plaintiff was instructed to rest from working out his upper left quadrant. (*Id.* at ¶ 65.) On October 27, 2017, plaintiff put in multiple sick call requests stating that he wanted morning medications to be discontinued and that he wanted medication for his stomach pain. Plaintiff refused his morning medications. (*Id.* at ¶ 66.)

On November 20, 2017, plaintiff put in a sick call request because his right hand had a bump on it and he had stomach pain for one year. (*Id.* at ¶ 67.) Plaintiff was seen by Dr. Martija for these complaints on November 27, 2017 and his Ranitidine (Zantac) was switched from an evening to morning medication. (*Id.* at ¶ 68.) Dr. Martija sees those inmates which are brought to her at sick-call. She does not receive sick-call requests directly from the inmates. (*Id.* at ¶ 69.) Though plaintiff occasionally mentioned abdominal pain to Dr. Martija and nurse Warkins as a result of taking the incorrect medication, neither individual ever saw evidence to support this claim. Plaintiff was assessed for abdominal issues on multiple occasions and the findings were normal. (*Id.* at ¶ 70.)

### *Facts Relevant to Defendant Lt. Erickson*

Defendant Tim Erickson was the jail administrator during plaintiff's detention in the jail in 2016-2018. He holds the rank of lieutenant. Lt. Erickson has been the jail administrator since 2008. ([73] at ¶ 3.) Jail administrator Erickson is responsible for the day to day operations and supervision of the jail and reports directly to the Sheriff. Lt. Erickson's duties include reviewing and responding to inmate grievances, communicating with medical staff on matters concerning the provision of medical care to inmates, and providing the jail doctor and nurse with logistical and other non-medical assistance in the jail. (*Id.* at ¶ 6.) Jail administrator Lt. Erickson is not a physician or nurse, and does not have a license to practice medicine. Lt. Erickson does not medically examine, diagnose, or treat inmates. Erickson does not order medications or pass them out to inmates. (*Id.* at ¶ 7.) During plaintiff's detention in the jail in 2016-2018, the jail provided medical care to inmates through licensed medical staff employed by ACH, a private healthcare company, under ACH's contract with Whiteside County and the Sheriff. (*Id.* at ¶ 8.) During plaintiff's detention in the jail in 2016-2018 a physician or physician assistant visited the jail once

7

every other week, but they were also available by telephone on an on-call basis 7 days a week, 24 hours a day. A nurse visited the jail five days a week for a total of 35 hours per week. A mental health professional visited the jail for up to four hours every week. (*Id.* at ¶ 9.)

Inmates with medical problems can see the nurse by submitting a written request using the sick call request form. Until early 2018, sick call request forms were available in paper form through jail officers. Inmates would fill the form out and submit it to a jail officer, who forwarded the form to the nurse. Since the beginning of 2018, sick call request forms are available electronically through kiosks or data terminals located in the cell blocks. The inmates can now sign on to the kiosk in their cell block using a pin code, and then fill out and submit a sick call request form electronically. The medical staff then addresses the inmate's medical request. (*Id.* at ¶ 10.) Completed sick call request forms are not and were not channeled through jail administrator Lt. Erickson, and he does not and did not receive or review sick call request forms submitted by inmates before the forms are or were received by the nurse. (*Id.* at ¶ 11.) In addition to on-site medical evaluation and care, ACH provides basic pharmaceuticals for inmates in accordance with the contract. Medications are prescribed by the jail physician or physician assistant, and the nurse is responsible for ordering them. Medications are usually handed to inmates by the nurse in the morning hours on the days she works in the jail and by the jail officers in her absence during the evenings or weekends based on the instructions of the nurse, physician, or physician's assistant. (*Id.* at ¶ 12.) It is jail procedure and practice for all jail officers and officials, including jail administrator Lt. Erickson, to defer to the medical judgment of the physician, physician assistant, or nurse and comply with their recommendations and instructions concerning the medical care and treatment of inmates. (*Id.* at ¶ 13.) Other than a clear emergency, it is jail procedure and practice to let only the ACH physician or physician assistant determine whether and when it is medically necessary or appropriate to refer an inmate for medical treatment or tests to a medical provider or facility outside the jail. Jail administrator Erickson does not make that determination, nor is he consulted before ACH medical staff makes that determination. The physician and physician assistant do not need the approval of jail administrator Erickson before referring an inmate for outside non-emergency medical treatment or tests. (*Id.* at ¶ 14.)

Jail administrator Erickson's involvement with plaintiff's medical care during plaintiff's detention in the jail was limited to reviewing and responding to plaintiff's oral and written complaints or grievances. (*Id.* at ¶ 15.) The first time plaintiff complained to Lt. Erickson about medical issues was on or about November 22, 2016, when he complained verbally and also submitted a written complaint about his interactions with Dr. Martija and Warkins. Plaintiff asked Lt. Erickson to talk to Dr. Martija and ask her to put him back on his previously-prescribed medication, which plaintiff said had been working well, and to talk to nurse Warkins about her "unprofessional conduct." (*Id.* at ¶ 16.)

After receiving plaintiff's November 22, 2016 complaint, Lt. Erickson spoke with nurse Warkins about plaintiff's concerns. Nurse Warkins told Lt. Erickson that Dr. Martija had met with plaintiff during her visit to the jail on November 10, 2016; Dr. Martija had discontinued plaintiff's previously prescribed medications and prescribed a new blood pressure medication for plaintiff because she was concerned about his elevated blood pressure; and ordered the nurse to check plaintiff's blood pressure three times a week. Nurse Warkins told Lt. Erickson that plaintiff was no longer complying with Dr. Martija's orders because he disagreed with the doctor's assessment

8

and was upset about the change in medication. Nurse Warkins said she had seen plaintiff on November 21 and 22, 2016, and he was not allowing her to check his blood pressure and had stopped taking his blood pressure medication. Nurse Warkins said that the medical staff had thought of placing plaintiff on suicide watch for neglecting his health and refusing medical care, but they determined he was not a suicide risk after the mental health counselor, Tracy Banks, met and evaluated plaintiff on November 22, 2016. Instead, Dr. Martija had ordered plaintiff to be placed on medical observation and to call an ACH medical provider if he displayed certain symptoms of hypertension. Nurse Warkins also informed Lt. Erickson that plaintiff was already scheduled to see Dr. Martija for a follow-up visit the following day (November 23, 2016). (*Id.* at ¶ 17.)

Lt. Erickson also spoke to Dr. Martija about plaintiff's concerns when she visited the jail on November 23, 2016. Dr. Martija told Lt. Erickson she was aware that plaintiff was upset that she had changed his medication, and the nurse had reported to her that plaintiff was refusing blood pressure monitoring and medication. Dr. Martija explained that she had met with plaintiff on November 10 and 23, 2016, and discussed her assessment and change in medications with him. Dr. Martija explained that, in her assessment, plaintiff had high blood pressure, which she planned to monitor and treat with medication. Dr. Martija also explained that she had reviewed plaintiff's medical and mental health history and records, and, in her assessment, plaintiff did not present a medical need for one of the two previously-prescribed medications any longer, and she had explained to plaintiff that the new blood pressure medication she had prescribed for him had a similar action to one of the medications she had discontinued. (*Id.* at ¶ 18.) Dr. Martija assured Lt. Erickson when they spoke on November 23, 2016 that she was aware of plaintiff's medical and mental health needs; that she was addressing those needs; that she was trying to provide treatment for the problem she was concerned with – his high blood pressure – and that she had explained to plaintiff the importance of taking the new medication and lowering his blood pressure. (*Id.* at ¶ 19.) In his affidavit, Lt. Erickson attested that after speaking with Warkins and Dr. Martija, he spoke with plaintiff about his November 22, 2016 complaint. (*Id.* at ¶ 20.)

During the remainder of 2016 and 2017, plaintiff spoke with Lt. Erickson several times and expressed his dissatisfaction with Dr. Martija for not prescribing him certain medications. Plaintiff also brought up his abdominal issues. Lt. Erickson did not receive any written complaints from plaintiff in 2017. (*Id.* at ¶ 21.) Lt. Erickson discussed plaintiff's medical concerns with Dr. Martija several times in late 2016 and in 2017 when she visited the jail. Dr. Martija assured Lt. Erickson that she was aware of plaintiff's medical needs and was providing him treatment. Lt. Erickson also learned that plaintiff saw the nurse and mental health counselor fairly regularly during that time period but had refused to see the doctor on a number of occasions. (*Id.* at ¶ 22.) Lt. Erickson testified that based on his interactions with plaintiff and the medical staff, he did not see any reason to believe that plaintiff was not receiving appropriate medical care at the jail in late 2016 and 2017. (*Id.* at ¶ 23.)

Lt. Erickson told plaintiff in response to his verbal complaints in late 2016 and in 2017 that he, the nurse, and the mental health counselor could not prescribe medication (only the doctor could), and plaintiff should follow the doctor's orders. (*Id.* at ¶ 24.)

9

On April 3, 2018, plaintiff submitted a grievance in which he complained of stomach problems, nightmares, a taste of leather or metal in his mouth, and cold sweats, all of which he said had been brought to the attention of medical and mental health staff. Plaintiff also complained that medical staff was not following the recommendations of the mental health staff. Plaintiff expressed dissatisfaction with Dr. Martija and requested to be seen by another doctor for a second opinion. (*Id.* at ¶ 25.) Plaintiff's April 3, 2018 grievance was forwarded to medical staff. In response, nurse Jerri Blumhoff reviewed plaintiff's medical and mental health history and records, performed a complete health assessment on April 6, 2018, consulted with Dr. Martija, and responded to the grievance on April 9, 2018. (*Id.* at ¶ 26.) Plaintiff replied to the nurse's response on April 12, 2018, and again asked to consult another doctor. (*Id.* at ¶ 27.) Lt. Erickson reviewed the nurse's response, found it satisfactory, and responded to plaintiff on April 12, 2018. (*Id.* at ¶ 28.)

On April 27, 2018, plaintiff submitted another grievance requesting to be seen by another doctor, not Dr. Martija. (*Id.* at ¶ 29.) Plaintiff's grievance was forwarded to the medical staff. Nurse Blumhoff responded to plaintiff on April 17, 2018 and informed him that she had spoken with her supervisor, and that plaintiff's medical chart was being reviewed by ACH's medical director and staff and asked him to wait until they completed the review. (*Id.* at ¶ 30.) Plaintiff sent a request to Lt. Erickson on May 7, 2018 following up on his April 17, 2018 grievance. Lt. Erickson responded on May 14, 2018 that the ACH medical director was still reviewing plaintiff's medical chart and if medical staff passed on any information to Lt. Erickson, he would address it. (*Id.* at ¶ 31.)

During plaintiff's detention in the jail in 2016-2018, Lt. Erickson did not receive, orally or in writing, any request or recommendation from Dr. Martija or any other medical provider to send plaintiff to a medical provider or facility outside the jail for medical care or treatment. (*Id.* at ¶ 32.) Lt. Erickson testified that, not being a medical provider, he relied on the medical judgment of Dr. Martija and the nurse for the care they provided plaintiff. Based on what plaintiff complained about and what Dr. Martija and the nurse explained to Lt. Erickson, Erickson did not see any basis to doubt that plaintiff was receiving proper medical treatment and medications or question the judgment they exercised with respect to treating plaintiff's medical problems. Lt. Erickson assumed the medical staff was aware of and treating plaintiff's problems adequately. (*Id.* at ¶ 33.) Lt. Erickson also testified that based on his knowledge of plaintiff's complaints and his conversations with Dr. Martija and the nurse, he did not believe at any time that medical staff delayed or denied plaintiff any medically necessary care, treatment, or medication. (*Id.* at ¶ 34.)

### C.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the

adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). If the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citation omitted).

D. ANALYSIS

1. **Defendants are Entitled to Summary Judgment on Plaintiff's Claim of Inadequate Medical Care**

Defendants Dr. Martija and nurse Warkins argue that they are entitled to summary judgment on plaintiff's medical claim because: (1) plaintiff fails to show any serious medical need in regard to his abdominal issues; (2) that even assuming plaintiff had a serious medical need, they did not act with deliberate indifference; and (3) they are entitled to qualified immunity. ([71] at pgs. 2-13.) Defendant Lt. Erickson argues that he is entitled to summary judgment on plaintiff's claim "because it is undisputed that he investigated plaintiff's complaints, discussed plaintiff's concerns with the medical providers, verified and received assurances from the medical providers that they were monitoring and addressing plaintiff's medical needs, and relied on the medical providers' professional judgment." ([74] at pg. 2.) Defendant Lt. Erickson argues further that because he, a non-medical jail official, reasonably investigated and relied on the medical providers' professional judgment and had no reason to know that the medical providers were failing to treat or inadequately treating plaintiff, he cannot be held liable as a matter of law, whether or not the medical defendants are found liable. (*Id.*)

At the outset, the court observes that since its initial screening order of the amended complaint, the Seventh Circuit has held that the deliberate indifference standard applicable to convicted prisoners under the Eighth Amendment does not apply to inadequate medical care claims brought by pretrial detainees (which plaintiff was at the time of the events complained-of in this lawsuit) under the Fourteenth Amendment. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Thus, the court analyzes plaintiff's allegations that he was provided with constitutionally-deficient medical care (with respect to his abdominal issues and PTSD/night terrors) under the modified standard, as set forth below.

To establish that medical care violates the Fourteenth Amendment, a detainee must show that (1) he suffered from an objectively serious medical condition, *see Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005), and (2) jail personnel "purposefully, knowingly, or perhaps even recklessly" disregarded a serious risk to his health or safety when treating the condition. *Miranda*, 900 F.3d 335 at 353-542. Negligence or even gross negligence is not enough. *Id.* Instead, a defendant's conduct must be objectively unreasonable, which means that the conduct must be "more than negligence . . . something akin to reckless disregard[.]" *Id.*

Defendants Dr. Martija and nurse Warkins argue that plaintiff's "abdominal issues" are not an objectively serious medical condition. ([71] at pgs. 2-3, 9.) In support of this contention, they point out that the ingestion of wrong medication on two occasions could not have resulted in plaintiff's complained-of abdominal pain (and related diarrhea) and they point to the affidavits of

11

Michael Uzer, M.D. and Travis Schamber, D.O. attesting to same.[6] Defendants' argument, however, is not well-taken given that it narrowly and selectively focuses on plaintiff's stomach-related problems (to the exclusion of his other ailments), and fails to take into consideration the seemingly ongoing nature of plaintiff's purported pain.

"An objectively serious medical condition is one that 'a physician has diagnosed as needing treatment' or that is so obviously serious 'that even a lay person would easily recognize the necessity for a doctor's attention.'" *McDonald v. Hardy*, 821 F.3d 882, 888–89 (7th Cir. 2016) (quoting *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009)). "[A] medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" can be an objectively serious medical condition. *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008). In this case, plaintiff submitted a sick-call request on March 30, 2016 complaining that, after having ingested the wrong medication three days earlier, he was experiencing tightness in his chest, an upset stomach, his "abdominal muscles started like spasming," and he had "a runny bowel movement." ([69-3] at pg. 27; [69-4] at pg. 27.) Later, in June 2016, after returning to the jail from a short stay at Stateville, plaintiff complained to nurse Warkins that he was still experiencing abdominal issues. ([69-3] at pgs. 33-35.) In July 2016, plaintiff was seen by medical personnel for complaints of abdominal pain and diarrhea. ([69-4] at pg. 19.) Plaintiff continued to complain about abdominal pain. ([69-5].) At the time of plaintiff's deposition, he claimed that he was still experiencing abdominal pain. ([69-3] at pgs. 30-1.) Furthermore, plaintiff testified that prior to his incarceration at the jail, he began suffering from nightmares and waking up with an unfavorable taste in his mouth. ([69-3] at pgs. 16-18.) As a result of these symptoms, he was diagnosed with PTSD by the IDOC. (*Id.*) Upon arriving at the jail, plaintiff was taking Paxil (for PTSD), Naproxen, and Prazosin (for high blood pressure). ([69-4] at pgs. 1-68.) As such, there is sufficient evidence in the record to establish that plaintiff had an objectively serious medical condition.[7]

However, there is no evidence before this court to suggest that any named defendant acted in an objectively unreasonable manner with respect to plaintiff's serious medical condition. Rather, the record before this court is replete with evidence showing that plaintiff's medical concerns (related to his abdominal problems and his PTSD/night terrors) were promptly attended to and that he received a steady course of medical attention and treatment for same.

Specifically, the record shows that plaintiff frequently met with Dr. Martija during the time period relevant to the amended complaint for his abdominal issues and his PTSD/night terrors. The record shows that Dr. Martija attempted to accommodate plaintiff's concerns related to his PTSD and sleeping problems/night terrors by trying different combinations and doses of medication. Plaintiff's medical records show that plaintiff received Remeron and Prazosin for some time under Dr. Martija's care, and that when she believed that plaintiff was complaining that those medications were not effective (and therefore wanted more than the current dosage), she discontinued those medications and prescribed a different medication (Clonidine). Although plaintiff testified that he did not ask for an increase in Remeron and Prazosin, he also testified that

---

[6] The court notes that defendant Lt. Erickson's brief does not address the first/objective prong of the analysis.
[7] Points I(A) and II(A) of defendants' summary judgment motion, which correspond to this particular issue, are therefore denied.

he believed Dr. Martija simply confused his request at that time. The record shows further that Dr. Martija examined plaintiff in response to his complaints of abdominal pain and diarrhea (symptoms which he believed were caused by his ingestion of the wrong medication) and monitored him accordingly. Additionally, Dr. Martija was of the opinion that the medications mistakenly given to plaintiff could not have caused the complained-of symptoms. Rather, plaintiff's medical records show that, in July 2017, plaintiff had an infection and blood in his urine, which Dr. Martija believed may have caused plaintiff's abdominal pain. Dr. Martija arranged for the infection to be treated with Bactrim.

Similarly, the record shows that plaintiff was attended to and his medical concerns for his abdominal problems and PTSD/night terrors were addressed by nurse Warkins beginning in June 2016 up through the time she left the jail in March 2017. The record also shows that nurse Warkins responded to plaintiff's concerns about his medication and abdominal issues in June 2016 (after plaintiff returned to the jail after a short stay at Stateville) when she came to his cell in-person. Although plaintiff testified that nurse Warkins initially became frustrated with him on this particular occasion and walked away before he could convey his concerns, he also testified that she returned to his cell and he explained to her that he was having abdominal pain (which he believed was attributable to taking the wrong medication). Plaintiff's medical records also show that he met with nurse Warkins in early July 2016 complaining of abdominal pain and diarrhea, and that plaintiff's concerns were forwarded to a doctor (which led to a prescription for Zantac). The record also shows at least two instances when plaintiff met with nurse Warkins – for example, on November 14, 2016 and December 28, 2016 – and he refused to allow her to attend to him/treat him.

Plaintiff may have not have received the particular care/treatment he would have liked from the medical staff at the jail (in terms of medications, medication doses, access to doctors/specialists, the ordering of diagnostic tests, etc.) with respect to his abdominal problems and his PTSD/night terrors. But, inmates are not constitutionally entitled either to "demand specific care" or even to receive the "best care possible[,]" *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), and it is clear from the copious evidence before this court that plaintiff's various medical complaints were promptly responded to and treated accordingly by jail medical personnel, including Dr. Martija and nurse Warkins, based on the evolving picture of his health (and his particular concerns/symptoms) during the time period relevant to the amended complaint.

With respect to Lt. Erickson, the evidence shows that his involvement in plaintiff's medical care during the time-period at issue in this lawsuit was limited to reviewing and responding to plaintiff's oral and written complaints or grievances. The evidence also shows Lt. Erickson reasonably responded to plaintiff's medical-related complaints. To be sure, defendants have provided evidence establishing that: in accordance with his duties and responsibilities as a jail administrator, Lt. Erickson promptly investigated plaintiff's concerns about his medical care; that Lt. Erickson discussed plaintiff's concerns, at length, with Dr. Martija and nurse Warkins; that Lt. Erickson verified that medical staff was monitoring and treating plaintiff; and that Lt. Erickson received assurances from Dr. Martija that she was aware of plaintiff's medical needs and was providing him with treatment. There is nothing before this court that suggests that Lt. Erickson had any reason to believe that the medical staff was not treating plaintiff (or was inadequately treating him), and, as a non-medical official, Lt. Erickson was entitled to rely on the professional

judgment exercised by plaintiff's medical providers. *See Arnett*, 658 F.3d at 755 ("Non-medical defendants . . . can rely on the expertise of medical personnel."); *see also Knight v. Wiseman*, 590 F.3d 458, 465 (7th Cir. 2009) (Where non-medical defendants investigate a prisoner's complaint and refer it to responsible medical providers, there is a presumption that they are entitled to defer to the professional judgment of the medical providers on questions of care).

As a final matter, the court notes that there is nothing in plaintiff "response" ([83]) that changes the above analysis. The portions of plaintiff's response that are specifically dedicated to his medical claim (rather than complaints about the fact that he is proceeding *pro* se in this lawsuit) are largely focused on two things: (1) his generalized expressions of dissatisfaction with the way defendants responded to/handled his medical concerns; and (2) his subjective beliefs about the merits of his case and the fact that he could have – but admittedly did not – gather evidence to support his claim.[8] ([83] at pgs. 1-2.) Plaintiff's vague, unsubstantiated contentions that defendants did not act appropriately and/or ignored his medical concerns and his conclusory/hypothetical statements that he could prevail if he was afforded any opportunity to litigate this case at the trial phase are insufficient to defeat summary judgment. At this stage of the proceedings, it is not enough for plaintiff to merely assert, without any evidentiary support, that his constitutional rights were violated by defendants and that a jury must now decide this issue. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("As we have said before, summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.").

Accordingly, for the reasons stated above, the court finds that defendants are entitled to summary judgment on plaintiff's inadequate medical care claim. The portions of defendants' motion pertaining to this issue – [71] at points I(B) and II(B) and [74] at I(A) -- are therefore granted.

2.  **The Remaining Arguments in Defendants' Motions for Summary Judgment**

Defendants Dr. Martija and nurse Warkins argue that they are entitled to qualified immunity with respect to plaintiff's inadequate medical care claim. ([71] at pgs. 8-9, 12-13, points I(C), II(C).) Because, however, the court finds that defendants Dr. Martija and nurse Warkins are entitled to summary judgment with respect to plaintiff's constitutional claim (as discussed above), it is not necessary to address their qualified immunity argument. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir.1997) (when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity). Additionally, given the disposition of plaintiff's medical care claim (as against the medical provider defendants), the court finds no need to address defendant Lt.

---

[8] The court notes that plaintiff's response also refers to certain alleged "retaliatory action" taken on the part of defendants. ([83] at pgs. 1-2.) As noted above, plaintiff submitted a *pro* se amended complaint after his recruited counsel was permitted to withdraw, and the court screened the amended complaint, and determined that it sufficiently stated a claim for deliberate indifference to his serious medical needs against Lt. Erickson, Dr. Martija, and nurse Warkins. (*See* [20].) For the reasons explained in the court's June 30, 2017 screening order, all other claims and defendants – including a claim for retaliation – were dismissed. (*Id.* at pg. 4.) As such, there is no retaliation claim before this court.

Erickson's remaining arguments that he cannot be found liable in this action regardless of whether the medical provider defendants are found liable. ([74] at pgs. 8-12, points I(B), (C).)

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment [69] [72] are granted. Plaintiff's inadequate medical care claim is dismissed with prejudice. Given that there are no remaining claims or defendants in this action, the case is dismissed in its entirety. Final judgment shall enter.

If plaintiff wishes to appeal, he must file a notice of appeal with this court within thirty days of the entry of judgment. *See* FED. R. APP. P. 4(a)(1). If plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* FED. R. APP. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider this court's ruling to preserve his appellate rights. However, if plaintiff wishes the court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* FED. R. CIV. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* FED. R. CIV. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. See FED. R. APP. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* FED. R. CIV. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* FED. R. CIV. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* FED. R. APP. P. 4(a)(4)(A)(vi).

Date: 4/09/2019          ENTER:

*Philip G. Reinhard*
United States District Court Judge

Docketing to Mail Notices. (LC)